Mr. Stubbs? Yes, good morning, Your Honours. I represent the plaintiff appellant, Karen Lamantia, in this matter. As has already been indicated by the Court, the plan in this case is different from those that you have been talking about in the first two cases. I believe it's an earlier incarnation. Essentially, fibromyalgia is not excluded from the conditions that may be considered in giving rise to disability. Chronic fatigue syndrome, or anything that's equivalent to it, is excluded. Depression would be excluded unless it results in hospitalization. Epstein-Barr virus is mentioned as well. And, of course, this is a case where the claimant, Ms. Lamantia, had a number of conditions, or potential conditions, some of which may have been excluded from consideration. She had depression, no dispute about that. That would be excluded. And chronic fatigue syndrome was mentioned by her treating doctor, Dr. Agreste. And I think it is most unfortunate that she did mention chronic fatigue syndrome. She also mentioned something else called chronic immune deficiency fatigue syndrome as well at other points. And it really isn't clear whether that is the same thing as chronic fatigue syndrome. On its face, it would appear not to be. Ms. Lamantia clearly suffered from an immune deficiency that was diagnosed in February of 1995 by Dr. Frederick Herman. That followed an episode of pneumonia when she was hospitalized for pneumonia in December of 1994. And she was sent to see Dr. Herman, who's an allergist and an immunologist, because she basically wasn't getting better from the pneumonia. And he ran some lab tests on her in February of 1995. And that's when he found the IgG subclass 3 deficiency. Which basically is an immune deficiency, which I believe is characterized by recurrent infections. And Dr. Herman, and even Dr. Wood, who was the plan's IME doctor in July of 1997, agreed that my client suffered from these recurrent infections. Chronic bronchitis, sinusitis, pharyngitis, coughing, asthma was diagnosed. In fact, in August of 1996, I believe, Dr. Agreste got a nebulizer for her because of severely impaired breathing was on the prescription, I believe. So, all of these things clearly indicate that she did suffer from an immune deficiency. And the plan's IME doctor, Dr. Wood, in July of 1997, said she was disabled from her job at Hewlett-Backard due to chronic bronchitis. So, one of the problems is chronic fatigue syndrome. Now, chronic fatigue syndrome, as you're probably aware, is by definition an unexplained set of symptoms characterized by fatigue. You have to eliminate any other known cause of fatigue before you can diagnose chronic fatigue syndrome. And Dr. Agreste, who is an osteopath, is the only doctor who said that my client had chronic fatigue syndrome. When the plan sent my client to a rheumatologist in January of 1997, Dr. Stanley Nagawa, Dr. Nagawa said that he could not confirm the diagnosis of chronic fatigue syndrome. And I think, as this court pointed out in the Jordan case, one of the hallmarks of fibromyalgia is fatigue. She also has a chronic immune deficiency with all these chronic recurring infections that certainly were the cause of fatigue in her case. And if you go on the Centers for Disease Control website where they talk about chronic fatigue syndrome, I don't know if this website was up in 1997, but doctors should have known about this, of course, it does confirm what I've been saying. But you have a more specialized doctor, Dr. Stanley Nagawa, a rheumatologist at UC Davis, saying that he cannot confirm that she has chronic fatigue syndrome. My submission to you is that it's certainly not reasonable of the plan to ignore the opinion of a more specialized expert, Dr. Nagawa, over the opinion, the unsupported opinion of a non-specialist such as Dr. Agreste. That's only one of many problems, I believe, with the way in which VPA adjudicated this case. Where, on what do you rely for opinion of limitation of functions that would preclude work? Well, you have. I know you, I know she has these things, but I just, I'm trying to tie it to the vocational ability. Well, and this again goes to one of the problems with the way the VPA handled this case. There are at least two doctors. Dr. Nagawa said that she was disabled from her job at Hewlett-Packard, because he was only asked, of course, at that point to express an opinion regarding her job at Hewlett-Packard, because that was before the long-term disability claim was filed. You have Dr. Wood, who saw her in July of 97, and was only asked to see her by Hewlett, by VPA, for short-term disability purposes, which is a direct violation of the claims processing duties, which require, it says, shall send the claimant for an IME in all appeal review cases, unless the organization, meaning Hewlett-Packard, directs otherwise. So, you know, they could so easily have asked Dr. Wood, for example, and Dr. Lyons, who was the psychiatrist, to express an opinion about her ability to work in any occupation. But we do know that Dr. Wood and Dr. Nagawa, and then later Dr. Herman, who I think was the immunologist, the allergist, in July of 1997, on July the 3rd, in a return-to-work slip, confirmed that she was disabled, not only from her job in Hewlett-Packard, but also from any job outside of Hewlett-Packard. Now, that was a document that never was obtained by VPA, because VPA never got the complete records of Dr. Herman. Now, that was a serious error on its part, because, as I explained to you, she had been seeing Dr. Herman because of her inability to get over the pneumonia from February of 1995 onwards. And when she first applied for short-term disability payments in August of 1996, VPA got her records from the treating doctor, who was Dr. Agreste. In those records is a letter dated August the 14th of 1996, from Dr. Herman to Dr. Agreste. And that letter says, as you know, I have been treating this patient for some time, because of her chronic immune deficiency and various problems of that kind. So you would think that that would trigger a reasonable person to get the records of Dr. Herman going back to February 1995. But they never did. When Ms. Lamantia applied for LTD benefits, they asked Dr. Herman to supply his records only from January 1 of 1997. And so the result of that was that they got a copy of a letter that he had sent on April the 2nd of 1997 to Dr. Agreste, and they got some treatment notes, I think, some of which did go back to October the previous year. But they didn't get his full records, and they never asked for them. And, I mean, it's plain to anybody, plain to Dr. Wood even, that she had chronic bronchitis, and that was a disabling factor. Now, I know you've asked me, well, where is there in these records something that talks about limitation of function? There's nothing that directly speaks to that, other than saying the two doctors, or maybe three, that said she couldn't do her job at Hewlett Packard, which, by the way, is a sedentary job involving sitting for seven hours, maybe one hour of walking about because you have to go to the fax machine, and maybe lifting binders that weigh, you know, no more than 10 pounds. And, I think very importantly, VPA had my client fill out a daily activities questionnaire and a job duties to explain, in detail, how her disability affects her, not only in her work, but also in her daily activities. Had her fill out a job questionnaire that detailed all of her duties and how she believes that her condition makes her unable to perform her job. And it said, right at the top of that daily activities questionnaire, we will take this information into account in deciding whether you are disabled as a matter of law. There is no evidence in that file that they ever took that information into account. They asked her for the names of people who could speak to her disability. And she gave them the name of her roommate, I believe Sherry Anderson, and her employer, her supervisor, Don Valentine. No evidence that VPA ever contacted either of those people to find out what her condition was and how it affected her in her daily living. If you look at what she put in her daily activities questionnaire, she tells VPA in there that she can't even perform her daily washing functions. Who has a burden on this? If she has a couple of people who could testify to her disability, does she have to bring them forward? I mean, you're saying that VPA doesn't. I would say that VPA assumed to itself the duty of gathering that information. It told her in that daily activities questionnaire, give us the names of people whom we can speak to and who can tell us about your disability. It told her that they would do that, and I think having assumed to itself the duty and the burden of doing it, then VPA had a responsibility to do it. I'd also point out, and I think this is important, that Dr. Wood's report, apart from the fact that it has on its face some rather serious errors in it, where he talks about, in one paragraph, the fact that the diagnosis of fibromyalgia appeared suddenly in December of 1996, and then two paragraphs later he says, Dr. Herman diagnosed her with fibromyalgia in July of 1996. And so on its face, I mean, it looks like he didn't read his own letter. He says that he doubts the diagnosis of fibromyalgia because he had to abort the pressure point test because he thought that she was engaging in blatant exaggeration, although he doesn't explain, you know, any further information about that. He just aborted the test. I believe that VPA had a responsibility under its claims processing duties to send a copy of that report to Dr. Herman and to Dr. Nagala, who had both said she had fibromyalgia, to ask those doctors for their comments. One of their claims processing duties is to discuss claims with doctors and to review claims with doctors. Remember that in the Jordan case, the Jordan v. MetLife case, MetLife had sent its IME doctors' reports to Jordan's doctors for their comments. And when Jordan's doctors didn't respond, this court said that it was reasonable for MetLife to discount the opinions of those treating doctors because they hadn't responded. And I would say that that plays the other way here. VPA should have sent Dr. Wood's report to Dr. Herman and Dr. Nagala. And its failure to do so undercuts as well VPA's reliance on Dr. Wood's report. I think this is a two-way street here. And that was another serious error. I think another serious error was the fact that in July of 1997, they only sent her for short-term disability IMEs to Dr. Wood and Dr. Lyons, who's a psychiatrist, which gave them the perfect excuse for ignoring those reports to the extent that they were favorable to Lamantia by saying, well, we only sent her for short-term disability review, not for long-term disability review. Dr. Lyons is the only psychiatrist, I believe, who actually discusses the fact that her depression is not disabling. She had been seen by a Dr. Rosenberg. Actually, I don't think he's an MD. I think he's a PhD psychologist. And he sent her to Dr. Mattani, who prescribed the medication. But I don't think there's any evidence in the records of those doctors that they ever discussed whether that depression was sufficient to disable my client from her job. Dr. Lyons is the only doctor who said it's mild, it's non-disabling. And it was an abuse of discretion, I believe, not to credit that report. So, yes. I would like to reserve some time if I'm getting close to my limit. Roberts. You have about three and a half minutes. Thank you for your argument. Mr. Bush, you're back up. Good morning again. This is the last of the three cases to be heard today involving Hewlett-Packard's disability plan. This is the second time that we are before this Court. The last time, the Court remanded it back to Judge Carlton and directed him to apply an abuse of discretion standard. The Court also rejected some of the arguments that I had made regarding the tolling of the statute of limitations. That issue is no longer before this Court. Now, the question, only one before this Court today, is whether, as Judge Carlton concluded, VPA's decision to deny Ms. LaMantia long-term benefits was a reasonable decision. Was it based on reasonable evidence? What was the basis of her disability? It was set out in her lawyer's letter of June 10, 1997, fibromyalgia, pulmonary problems, and immune deficiency syndrome. This is the one that Dr. Agreste referred to as chronic fatigue immune deficiency syndrome at one point. I just would call the Court's attention again to the plan where it says that any condition diagnosed as or without regard to its designation is equivalent to chronic fatigue syndrome is to be excluded for purposes of long-term disability benefits. Now, Ms. LaMantia contends that the burden in this case was not on her to prove her disability. And I think on that score she is wrong, and this was addressed by Judge Carlton. The plan itself says, and it's at ER 600, the member shall be solely responsible for submitting the claim form and any other information or evidence on which the claim. And in this instance, remember that from an early stage, in terms of her application for disability benefits under this plan, she was represented by counsel, counsel who took an active role in the marshaling of the evidence on her behalf, who argued that evidence and told VPA what he thought on her behalf was most important. Now, VPA did not sit on its hands regarding this claim. On February 13th, 1997, VPA sent letters to Dr. Agresti and to Dr. Coubré. Dr. Coubré was her pulmonary specialist. It's found at ER 338 and ER 365. Remember, one of her conditions or claims is chronic bronchitis. On March 27th, 1997, VPA sent letters requesting medical files to Dr. Rosenberg, the clinical psychologist, and Dr. Matani, her psychiatrist. That's found at ER 236 and 297. On April 28th, 1997, VPA sent a letter requesting medical files to Dr. Herman, and that's at ER 258. Now, we do know that some of these files from Dr. Herman were not found in the record before Judge Carlton. I was asked why. I was actually issued an OSC to respond as to why they were missing. We don't know why. They weren't removed intentionally. If they were lost, they were lost. But what we do know is that almost each and every one of the documents that counsel cited as not being present before as part of the record were, first of all, part of a digest of medical records that is found in the record. If you look at pages ER 197 through 200, you'll see these letters described and digested. I don't know why the letters themselves weren't there. I cannot explain that. But they were digested. More importantly, Dr. Wood says that he was given these reports by Ms. Lamantia, specifically the one by Dr. Herman from June of 1997. Now, maybe the reason why the June 1997 is not part of the full record is because June comes after April 28th, and it didn't exist, and Dr. Herman didn't send it. But we do know that there is a summary of it in VPA's records, and we do know that Dr. Wood considered it. We do know that VPA scheduled three separate independent medical examinations, Dr. Nagua in January of 1997, Dr. Lyons in July of 1997, and Dr. Wood in July of 1997. These are all for short-term disability. The definition given was Could you please take that cell phone out of the courtroom right now? Just walk out. Were all three of these consultations for purposes of short-term disability? The definition provided to Dr. Nagua and Dr. Wood were the short-term definition. I think as the Taft case indicated, the fact that you may have given the wrong definition to the doctor does not mean that you, the plan administrator, cannot look at the underlying conclusions with respect to the conditions which may or may not be disabling. So the fact that maybe the wrong definition had been provided to Dr. Wood should not be in and of itself determinative if you look at the Taft case. I believe it's the Taft case. I'll check my notes here. Sorry. It was, yeah. Yes. It was the Taft case, 9F, 3rd, 1469, before this Court. The let's look at the mistakes that counsel raised in the reply papers and in his oral argument. He first cites and says, you made a mistake because you concluded that she was disabled due to depression.  And Dr. Lyons said you would know that he did not find that she was not suffering from depression. That's not true. If you go to Dr. Lyons' report, what he said was is that her depression is to a reasonable medical certitude physiolic, not psychiatric. And with that, he concluded that there was no psychiatric basis for her to not be able to fulfill the usual and customary duties of her job. Aha, there it is. It's short-term disability benefit also for Dr. Lyons. So thank you, Your Honor, for pointing that out. He did not find that she did not have depression. He found that it was not psychiatric in nature, that it was physiolic. But again, the terms of the plan say the illness, which has psychological or behavioral manifestations, that would be something physical, or results in impairment of mental functioning due to any causes, including but not limited to social, physical, chemical, or biological conditions. So if her depression is caused by social conditions, not psychiatric, that still falls within the definition of mental disorder and requires that there be, excuse me, hospitalization. And remember that Janet Currie, in denying the claim for benefits, also had the reports of her treating psychologists and treating psychiatrists, who both opined that she was suffering from depression. So it was not unreasonable for her to conclude or for VPA to conclude that Ms. Lamantia was suffering and that her total disability was contributed in part by a depression. Now, let's talk about another point, that chronic fatigue syndrome, that it was wrong to rely on Dr. Agresti and that Dr. Nagua found that she was not suffering from chronic fatigue syndrome. This is what Dr. Nagua says at ER 399. I am unable to affirm the diagnosis. This is under paragraph A, discussion. I am unable to affirm the diagnosis of chronic fatigue syndrome as put forth by the patient's primary physician. B, the patient is impaired from performing her usual duties as defined by the Hewlett-Packard documents, and so by her chronic fatigue. Dr. Nagua did not make a finding that she was disabled due to fibromyalgia. He found that she was impaired from performing her usual duties by basis of chronic fatigue. Remember, without regard to its designation, it's equivalent to chronic fatigue syndrome. He found simply, I can't say if it's chronic fatigue syndrome or not, it is fatigue. Dr. Wood, who did conduct an independent medical examination, did reach the conclusion that she was suffering from chronic fatigue syndrome. So we do have a rheumatologist. In his report, it's at ER 532, he did conclude that the Islamantia was suffering from chronic fatigue syndrome. Another point. Counsel said it was error to fail to give Dr. Wood's report to Dr. Herman. I'm sorry. I have to get back to the microphone. It was given to Dr. Herman. Look at ER 208. It's the letter from her lawyer back to the plan attaching Dr. Agreste's response. That letter says, Dr. Herman has been given Dr. Wood's report. He will be writing a reply. Please do not make a decision until you receive Dr. Herman's response. What happened? We know then that a few weeks later, and it's at ER 207, counsel writes to VPA saying, please hold off until Islamantia can provide you a written response by a In other words, Dr. Herman was not going to be responding to Dr. Wood's report. Don't know why, but that was being controlled by counsel from Islamantia. Now, we finally get, VPA gets something, and it's from Dr. Kneppler, and it's September of 1998, a year later. And what's notable is that he does not address whether she has fibromyalgia or not. He addresses the chronic bronchitis, and he notes that with respect to her selective IG3 deficiency, it's still unclear, and he says that it should cause recurrent infections, but her clinical history has not been characterized by that. So, in other words, she presents medical evidence that her chronic bronchitis, that we should be seeing recurrent infections, may have not occurred. That leaves fibromyalgia. And this is what Dr. Wood had to say on that point. Dr. Nagua's statement that the patient qualifies for a diagnosis of fibromyalgia utilizing the American College of Rheumatology is correct. This criteria simply states that the patient must have persistent symptomatology involving the upper half as well as the lower half of the body, the right half as well as the left half of the body, and must be tender in 11 of 18 tender spots to a minimum of 4 kilograms of pressure. His report is found at ER 530 through 533. Four kilograms is 8.8 pounds. Substantially, therefore, any patient with a low pain threshold less than 4 kilograms of pressure will, if they have diffuse symptomatology, qualify for this diagnosis. The American College criteria do not differentiate from any other cause of a low pain threshold. In my clinical experience, the patients with pure fibromyalgia have a pain threshold between 3 to 4 kilograms of pressure. Ms. Lamantia's complaint of pain on pressure was inconsistent with this experience. Her complaint was for pressure less than 2 pounds of pressure. That would be less than 1 kilogram. On one occasion, she complained of pain before any pressure was applied. This exaggerated response dramatically undercuts the credibility of her subject of complaint. In the context of an individual taking high doses of a narcotic medication on a daily basis for over 18 months, one of the known causes is of a low pain threshold. A clear-cut diagnosis of fibromyalgia must be considered even less of a probability. She was taking Vicodin for her chronic fatigue syndrome, and that's what he was attributing her tenderness to the medication that she was taking for an excluded condition. Continuing, I concur that she fulfills the American College of Rheumatology criteria for the diagnosis of fibromyalgia. I would suggest, however, that her low pain threshold is as much a consequence of narcotic usage as it is of fibromyalgia. I would further suggest that the patient's physical examination and credibility is damaged by apparent embellishment. We know that with respect to her chronic bronchitis, we have DPA also had all of the 19 to mid-1997. They essentially showed normal lungs. We know that she smoked eight to ten cigarettes a day and had been counseled to stop smoking by her pulmonary specialist and by Dr. Herman. So the question is, was VPA's decision supported by reasonable evidence on the record? I submit that it was. Does the panel have any questions? Roberts. I don't see any. Thank you for your argument. We'll hear a rebuttal argument at this time. Thank you, Your Honor. Mr. Stubbs. Thank you, Your Honor. It is an abuse of discretion for the plan or for the administrator not to follow the requirements of the plan and the administrative services agreement. And VPA did not follow those procedures. It did not schedule independent medical examinations directed to long-term disability as was required in addendum B to the administrative services agreement. It, that burden of submitting these reports to Dr. Wood's report, for example, should have been submitted by VPA. It's not an excuse to say, well, gosh, you know, LaMantia's counsel sent a copy to Dr. Herman. In fact, actually, the only way that Dr. Wood, I think, got anything from Dr. Herman was because LaMantia showed it to him. And by the way, Dr. Wood said, yes, she is disabled by chronic fatigue syndrome, but if you look at his report, and it's at ER 502, and I have it right here, this is what he says. He says, the patient's medical history and the records of the treating physicians clearly document an infectious illness in the winter of 94, 95, which resulted in chronic recurrent respiratory tract infections. The diagnosis of chronic fatigue syndrome was added by Dr. Herman early on in the course of her symptomatology. It is his opinion that she fulfills the CDC diagnostic criteria, and I would not presume to argue with his expertise in this matter. Well, the problem with that is that Dr. Herman never diagnosed her as having chronic fatigue syndrome. He is mistaking Dr. Herman for Dr. Agresti. Dr. Agresti wrote a letter, and I think it was dated June the 23rd of 1997, and if I Anyway, in that letter, she listed a host of things that were wrong with my client, and then at the end, she says chronic fatigue syndrome perins fulfills CDC diagnostic criteria. Dr. Agresti was the only doctor who ever said that my client had chronic fatigue syndrome. I disagree with Mr. Bush on this issue of chronic fatigue syndrome. It seems to me that for something to be equivalent to chronic fatigue syndrome, it must be an unexplained fatigue, because unexplained is the hallmark of chronic fatigue syndrome, regardless of the label. So calling something chronic immune deficiency fatigue syndrome seems to me not to be the same thing as chronic fatigue syndrome, because the insertion of immune deficiency creates an explanation that negates the unexplained feature of chronic fatigue syndrome. It is not a different label, I submit, for the same thing. And Dr. Kneepler, or Kneepler, obviously never had Dr. Herman's records, because if he had, he would have seen the history of recurrent infections. So his report is actually supportive of Lamenti in a sort of negative way, because he does say if you have this IgG3 subclass deficiency, you would expect to see recurrent infections, and I don't see any because he doesn't have the records of them. But we do have the records of them, and we know that they're there, and that is consistent at least with his generalization on that issue. So, yes, it was important for the EPA to fulfill its duties, and it didn't do so. And I discussed this at length in the reply brief, and I'd ask you to look at that case. Roberts. Okay. Thank you both for your arguments. Very interesting case. And the case will be submitted for decision, and the Court will stand in recess for the day.
judges: Canby, Thompson, Hawkins